**SAFFARI LAW GROUP**
NINAZ SAFFARI (SBN # 235811)
8383 Wilshire Blvd., Suite 830
Beverly Hills, CA 90211
Telephone: (310) 592-0247
Facsimile: (213) 402-2953
Email: ninaz@saffarilaw.com

Attorneys for Defendant
SHUKIMBA MALIK CARLIS

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>SHUKIMBA MALIK CARLIS,<br><br>Defendants. | Case No.: 2:25-cr-00249-MWC-2<br>Assigned to: Hon. Michelle Williams Court<br>Dept.: 6A<br><br>**DEFENDANT SHUKIMBA MALIK CARLIS' *SUPPLEMENTAL* SENTENCING MEMORANDUM**<br><br>Hearing: November 20, 2026<br>Time: 10:00 a.m.<br>Dept.: 6A |

TO: TODD BLANCHE, ACTING ATTORNEY GENERAL; BILAL A. ESSAYLI, FIRST ASSISTANT UNITED STATES ATTORNEY; JENNIFER L. WAIER, CHIEF ASSISTANT UNITED STATES ATTORNEY; AND THI HOANG HO, ASSISTANT UNITED STATES ATTORNEY of the UNITED STATES ATTORNEY'S OFFICE; and THE CLERK OF THE COURT for the CENTRAL DISTRICT OF CALIFORNIA:

Defendant Shukimba Malik Carlis ("Ms. Carlis"), through her counsel of record, hereby files her Supplemental Sentencing Memorandum pursuant to 18 U.S.C. § 3553(a), which is based on: (1) the November 6, 2026 Government's Sentencing Position regarding Ms. Carlis (Dkt. no. 62) (which was filed after Ms. Carlis' November 6th Sentencing Memorandum); (2) the November 13, 2026 sentencing hearing of co-defendant Sofia Vanessa Herrera ("Ms. Herrera"); (3) the November 13th revised Presentence Investigation Report ("revised PSR") regarding Ms. Carlis (Dkt. no. 70); and

(4) the November 17, 2026 Government's Supplemental Brief Re: Sentencing regarding Ms. Carlis (Dkt. no. 77).

Specifically, Ms. Carlis respectfully requests that the Court consider the fact that to date, including at said hearing, the Government has not presented any objective evidence (i.e., that did not come directly from Ms. Herrera) that the defendants used their respective personally-issued union credit cards interchangeably, much less that defendants conspired with each other in a joint criminal enterprise.

Ms. Carlis also respectfully requests that the Court distinguish the temporary hardship that will result to Ms. Herrera's husband when Ms. Herrera goes to prison from the homelessness of Ms. Carlis' severely mentally ill son should Ms. Carlis also be sentenced to prison.

Finally, Ms. Carlis respectfully requests that the Court, if disinclined to order home confinement, at least sentence her to a significantly lower term than the 18 months' custodial sentence it ordered for Ms. Herrera based on the fact that their situations are readily distinguishable.

Dated: November 18, 2026

Respectfully submitted,

**SAFFARI LAW GROUP, P.C.**

Ninaz Saffari, Esq.
Attorneys for Defendant
SHUKIMBA MALIK CARLIS

///

# SUPPLEMENTAL SENTENCING MEMORANDUM

## I.

## INTRODUCTION

On November 13, 2026, the Court sentenced Ms. Herrera to 18 months in prison. In doing so, it agreed with the Government that Ms. Herrera was jointly responsible for the entire $272,481.91 loss. Accordingly, the Court will presumably sentence Ms. Carlis to the same custodial term. However, this would be unjust for the reasons discussed below, including the fact that the evidence does not satisfy all three requisite factors of the United States Sentencing Guidelines ("U.S.S.G.") § 1B1.3 ("Relevant Conduct") that entitles the Court to punish each defendant for the entire loss (because they allegedly jointly executed the scheme and thereby conspired with each other).

In addition, Ms. Carlis' family situation also merits special consideration because unlike in Ms. Herrera's situation (where her temporarily disabled husband will be able to live with relatives during her prison term), Ms. Carlis' permanently mentally disabled son (age 22) will be rendered homeless and incapable of caring for himself (and does not have the option of living with anyone else, including relatives).

## II.

## NO EVIDENCE OF SHARING CREDIT CARDS, MUCH LESS CONSPIRACY

To date, the Government has not proffered any *objective* evidence that defendants shared their union credit cards and, instead, relies entirely upon Ms. Herrera's self-serving, specious claim that they did so. She made this allegation to ameliorate her own culpability for personally making approximately **83%** of the credit charges on her own card of the total $272,481.91 loss. In fact, the only other purported evidence that the Government claims supports this "interchangeable use" allegation is the single subject receipt from the Louis Vuitton boutique in Beverly Hills, which Ms. Carlis already discussed at length in her Sentencing Memorandum (Dkt. no. 57) at page 21: line 20 - page 22:25 (and, therefore, need not be repeated here).

Again, the Government relies on Ms. Herrera's baseless allegation to place the entire $272,481.91 loss on each defendant, which is both nonsensical and unjust. Specifically, **82.64%** of the total $272,481.91 ($225,189.67) in subject charges were incurred on Ms. Herrera's union credit card. And of that $225,189.67 sum, ***95.7%***

($215,429.47) was spent on retail items. Conversely, only **<u>17.36%</u>** of the total $272,481.91 ($47,292.24) charges were incurred on Ms. Carlis' own union credit card with 72.7% ($34,372.29) spent on retail items. (Collectively, retail items represent 79.06% [$215,429.47] of total subject spending across both cards.) However, if defendants did, in fact, share the credit cards, then why were more than four-fifths of the charges on Ms. Herrera's card? Why weren't the charges more evenly distributed? And since they each could spend as much as they wanted on their own individual cards, why would they need to switch cards on occasion? This theory simply makes no sense.

First, there is no evidence – including from Ms. Herrera herself – that defendants ever exchanged or otherwise shared any of these retail items. Indeed, this assertion would also be specious and nonsensical because both defendants purchased retail items for themselves alone and, again, had no need to share credit cards since they each had their own. Nor has the Government asserted that they "jointly" made any purchases.

The only possible *arguably* "plausible" explanation for defendants sharing cards would be to conceal their charges but this, too, is nonsensical – particularly because the Government has never alleged the same. Nor is there any assertion by the Government that they somehow benefitted from each other's charges, which the Government believes merits them deserving the same 18-month prison sentence. And aside from the single Louis Vuitton receipt, prior to Ms. Herrera's sentencing hearing (see below), the Government has relied entirely upon her unproven allegation.[1]

Accordingly, Ms. Herrera's claim should be rejected outright because it is uncorroborated. The Government's assertion that the Louis Vuitton receipt somehow proves Ms. Herrera used Ms. Carlis' card or vice-versa is purely speculative as no witness, CCTV footage, email, text message, recording (audio or visual), or any other *objective* evidence has proven this. This leaves only speculative allegations by the Government and the Department of Labor investigator who testified at Ms. Herrera's sentencing hearing (see below) to support its assertion that they used the cards

---

[1] "[T]he total loss was caused by defendant and co-defendant Carlis' jointly undertaken criminal activity…." *See* Dkt. no. 49 (Government's Sentencing Position regarding Ms. Herrera), 5:9-10. This is merely a conclusory allegation and not evidence in and of itself of a joint criminal enterprise.

interchangeably (and that, therefore, by definition, the defendants necessarily conspired with each other to commit fraud).

And in their initial Sentencing Position regarding Ms. Carlis, the Government merely refers to her initial PSR (Dkt. no. 44), as well as to the October 24, 2024 U.S. Department of Labor's ("DOL") Office of Inspector General's "Report of Investigation" (Dkt. no. 62-6) (Exhibit F to the Government's Sentencing Position regarding Ms. Carlis):

> Defendant and Herrera used the AFSCME Credit Cards ***interchangeably***. PSR ¶ 21, [f]n. [3]; see also Ex. F. …
>
> Notably, **the PSR notes that defendant and Herrera used the AFSCME Credit Cards *interchangeably***. PSR ¶ 21, n.2.
>
> Indeed, **Herrera acknowledged she and defendant used the credit cards interchangeably when shown evidence that her AFSCME Credit Card ending in -8979 was used by defendant, *inter alia*, on or about March 30, 2022, to purchase approximately $5,579 in luxury goods from Louis Vuitton in Beverly Hills**. See Ex. F at USAO_00005798, USAO_00005801.
>
> **This purchase was in addition to defendant's purchase, using her issued AFSCME Credit Card ending in -8607, at Louis Vuitton on or about March 31, 2022 to purchase $2,452.80 in luxury goods – conduct for which defendant has pleaded guilty**. See Plea Agreement ¶¶ 2, 9; Ex. F at USAO_00005805.

*See* Dkt. no. 62 (Government's Sentencing Position regarding Ms. Carlis, at 6:14-16; 10:22-11:5 [emphasis added]).

However, the initial PSR itself merely refers to Ms. Herrera's false claim to the DOL: "Per investigative reports from the Office of Inspector General, Carlis and Herrera used the AFSCME credit cards ***interchangeably***." *Id.*, ¶ 21, fn. 3 (emphasis added). In other words, the Government relies *entirely* on what Ms. Herrera told the DOL investigators about the Louis Vuitton receipt, which is memorialized in Exhibit F:

> On October 23, 2024, Special Agent (SA) Ivan Anguiano with the United States Department of Labor — Office of Inspector General (OIG) and Investigator (INV) Ryan Vescera with the U.S. Department of Labor — Office of Labor-Management Standards (OLMS) interviewed … Herrera…. SA Anguiano … showed Herrera a copy of Louie [*sic*] Vuitton's transaction receipt. SA Anguiano explained that

> the transaction shows Shakimba [*sic*] Carlis on the document but is charged to Herrera's credit card. Herrera stated that the credit cards were "used ***interchangeably*** (Attachment 1 [the Louis Vuitton receipt])." …

*Id*. at p. 1 of 2 (emphasis added).

However, this same interview confirms that Ms. Herrera made no less than ten (10) false statements to the DOL's investigators about the subject charges:

> SA Anguiano showed Herrera transactions that were used to purchase various retail items. Herrera stated that [1] **the union allowed them to buy items for themselves**…. Herrera also stated that [2] **she was not given the opportunity** … **to provide the receipts of the transactions**. Herrera stated that [3] "…**the treasurer can do whatever she needs to do to present well**." … Herrera stated that [4] she and Shakimba [*sic*] traveled a lot and [5] **were allowed to purchase clothing and luggage**….
>
> Herrera stated that [6] **she did not purchase … any Louie** [*sic*] **Vuitton items**. She also stated that [7] **she did not go to the Louie** [*sic*] **Vuitton store in Beverley** [*sic*] **Hills to purchase the items**.
>
> Herrera stated that [8] people in the office had access to her credit card. Furthermore, [9] **the administrative assistant to AFSCME Local 2620 had access to her credit card** to reserve rooms and purchase office supplies.

*Id*. at p. 1 of 2 (emphasis added).

The Government has already proven – including by Ms. Herrera's own February 20, 2026 Plea Agreement (Dkt. no. 37) – that all nine of the foregoing statements were false yet nevertheless it chooses to believe the <u>*tenth*</u> statement – i.e., that defendants shared cards. (For the record, no other union members ever had access to defendants' union credit cards, and no objective evidence has been presented to that end.)

More specifically, Ms. Herrera falsely told the DOL investigators that other people, *including* Ms. Carlis and Ms. Herrera's own administrative assistant, used Ms. Herrera's credit card to minimize and obfuscate her (Ms. Herrera's) own criminal culpability. Accordingly, the Government should not be allowed to cherry-pick which statements from Ms. Herrera it believes are true despite all her provably false statements, and the Court should therefore not accept this cherry-picking. In other words, either everything Ms. Herrera stated therein is true or is false – and since she clearly lied, everything she told the DOL investigators should be disregarded to prove the cards were shared. To put it another

way, either Ms. Herrera is credible or she is not – and if the Court finds her to be the latter, it should disregard her entire statement – including the tenth lie that defendants shared cards.

Finally, nowhere in the defendants' Plea Agreements is there any mention of sharing credit cards and, therefore, simply because they pled guilty to wire fraud does not also entitle the Government to (legitimately) claim they also essentially pled guilty to conspiracy or to otherwise jointly committing the Louis Vuitton (or any other) charges.

Otherwise, as was made clear at Ms. Herrera's sentencing hearing, the only purported evidence relating thereto was the testimony of DOL investigator Ryan Vescera ("Mr. Vescera"), who ***speculated*** that while defendants were in New York City in 2022, "they ***may*** have" used the union credit cards for personal expenses. In other words, even he was not convinced by Ms. Herrera when she told him during her interview that defendants had used the cards interchangeably.

In addition, Mr. Vescera could provide no evidence or even an explanation as to *why* he believed they *may* have done so. And despite his intensive, in-depth investigation (which he testified also included interviewing union members, Board members, trustees, and auditors, as well as reviewing the union's extensive audit), he clearly was unable to determine whether *in fact* defendants had shared credit cards. This falls woefully short of satisfying U.S.S.G. § 1B1.3'S three requisite factors (see below).

The federal Sentencing Guidelines do not allow courts to impose custodial sentences based on pure speculation and without actual, sufficient *objective* evidence. The reason here should hopefully be clear: forcing Ms. Carlis to serve the same amount of time in prison as Ms. Herrera when the evidence proves that Ms. Herrera was personally and *solely* responsible for 83% of the total loss is patently unjust – *and* unjustifiable. Without actual evidence, the Court should not paint both defendants with the same prosecutorial brush when the losses directly attributable to each are so highly disparate. This is not how justice is supposed to be meted out.

**III.**

**THE EVIDENCE DOES NOT SATISFY U.S.S.G. § 1B1.3'S FACTORS**

U.S.S.G. § 1B1.3, 18 U.S.C.A. ("Relevant Conduct -- Factors that Determine the Guideline Range") (effective November 1, 2026) states:

> …(B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were—
>
> (i) within the scope of the jointly undertaken criminal activity,
>
> (ii) in furtherance of that criminal activity, ***<u>and</u>***
>
> (iii) reasonably foreseeable in connection with that criminal activity; that occurred during the commission of the offense of conviction, in preparation for that offense, or **in the course of attempting to avoid detection** or responsibility for that offense; …
>
> (d) … applies to offenses where the offense level is determined largely on the basis of the total amount of … loss….
>
> **[A] case-by-case determination must be made based upon the facts of the case**….
>
> COMMENTARY … The conduct of others that meets all three criteria set forth in subdivisions (i) through (iii) (i.e., "within the scope," "in furtherance," and "reasonably foreseeable") is relevant conduct under this provision. However, **when the conduct of others does *<u>not</u>* meet *<u>any</u>* one of the criteria set forth in subdivisions (i) through (iii), <u>the conduct is *not* relevant conduct under this provision</u>**. …
>
> [T]he accountability of the defendant for the acts of others is limited by the scope of … her agreement to jointly undertake the particular criminal activity. Acts of others that were not within the scope of the defendant's agreement, even if those acts were known or reasonably foreseeable to the defendant, are not relevant conduct….

*Id*. (emphasis added).

In other words, a defendant's criminal conduct must satisfy all three prongs of this statute to constitute a common plan or scheme with a co-defendant to justify a sentencing enhancement based on total loss. But here, the Government's "interchangeable" claim is a factual assertion that must actually be *proven* and not merely *alleged* based on a self-serving interview of a co-defendant who made the vast majority of personal charges and made at least ten false statements therein to federal investigators. Otherwise, there is no legitimate evidence showing cross-use, shared approvals, shared delivery addresses, or that Ms. Carlis issued Ms. Herrera her own union credit card or otherwise authorized Ms.

Herrera to use it for non-union charges. On the contrary, because each card carried only its own holder's charges, this fact alone supports separate, self-interested conduct rather than a shared enterprise.

In addition, the Government claims that simply because Ms. Carlis was president, she necessarily signed off on or ignored Ms. Herrera's charges and therefore agreed to the scheme. First, however, there is no evidence that at the time the latter was making the subject charges, the former was contemporaneously aware she was doing so. Second, and far more importantly, knowledge – much less mere acquiescence – does not constitute an agreement under U.S.S.G. § 1B1.3.

Second, there is no objective evidence that defendants entered into any agreement – implicit or explicit – to use their union credit cards to make the subject charges. Nor is there any evidence that they worked together in any manner to cover up said charges. The 11th Circuit's recent opinion in *United States v. Barry*, 163 F.4th 1346 (11th Cir. January 7, 2026) is instructive (as Ms. Carlis' defense counsel was unable to find any 9th Circuit opinions regarding defendants who shared credit cards to commit fraud):

> [*1348] Abdoulaye Barry and his co-defendants used ***shared*** **stolen credit cards** … to purchase large amounts of cigarettes. As a result, they were charged with several fraud offenses. Barry alone went to trial, and a jury convicted him of a subset of the offenses.
>
> **At sentencing, the district court held Barry accountable for the *total* amount that he and his co-defendants charged on the shared credit cards *without first determining the amount for which Barry himself should be responsible*. That was a legal *error*. So we vacate Barry's sentence and remand the case to the district court for resentencing**. …
>
> [*1350] "[T]o determine a defendant's liability for the acts of others, the district court must first make individualized findings concerning the scope of criminal activity undertaken by a particular defendant." *United States v. Mateos*, 623 F.3d 1350, 1370 (11th Cir. 2010) (citation omitted); see **U.S.S.G. § 1B1.3, cmt. (n. 3(B))**. The district court thus committed a legal error when it concluded that "conspiracy ... equates to jointly undertaking criminal activity" and then failed to make individualized findings. This is because the scope of the defendant's jointly undertaken activity is not necessarily the same as the scope of the entire conspiracy, so the relevant conduct for each co-conspirator likewise is not necessarily the same. **U.S.S.G. § 1B1.3, cmt. (n. 3(B))**. … The rule is that **a sentencing judge *must* make individualized**

> **findings**. "[W]ithout individualized findings concerning the scope of [the defendant's] involvement with the conspiracy, it cannot be determined that [he] should be liable for some quantity less than all." *United States v. Ismond*, 993 F.2d 1498, 1499 (11th Cir. 1993). … [*1351] After careful review, we determine that *the record contains insufficient evidence for us to find that Barry* **necessarily** *should be liable for the conspiracy's **entire** loss amount*. … **The government also failed to connect *all* of the credit card charges to Barry. At trial, the government established that Barry and his co-defendants *used the same* stolen *credit cards, sometimes within one day of each other. But we cannot reasonably infer from shared usage that Barry knew about the other users and what they were doing with the cards*.** …
>
> [I]t is not Barry's burden to prove loss amount. *United States v. Medina*, 485 F.3d 1291, 1304 (11th Cir. 2007) ("**The amount of loss *must* be *proven* (by the government) by a preponderance of the evidence, and the burden *must* be satisfied** [*1352] **with *reliable and specific evidence***" (citation modified)). We sent the case back for re-sentencing because we could not determine the factual basis for holding the defendant responsible for every claim submitted to Medicare during the conspiracy. *Id*. at 1304–05.

*Id*. at 1348, 1350, 1351, 1352 (emphasis added).

Here, the Government did not allocate the specific share of the total loss to each defendant for which they were to be held individually accountable (including in their Plea Agreements). Instead, although the Government accurately identified how much was spent on each of their credit cards, it nevertheless allocated the total loss to *each* of them and asserts that each should be *responsible* for the entire amount. Again, it did so for the purpose of enhancing their prison sentences, to ensure they each received the same prison term, and to ensure they were both responsible for the entire loss as restitution.

Because Ms. Carlis' Plea Agreement (Dkt. no. 39) says nothing about her and Ms. Herrera interchangeably using their union credit cards, the Government must prove Ms. Carlis' explicit or at least implied agreement with Ms. Herrera to share cards, which they have yet to do. Whatever actually transpired on that single day in that single boutique has been left to pure speculation – something prohibited by the Sentencing Guidelines.

And even if *arguendo* Ms. Carlis did use Ms. Herrera's card at Louis Vuitton that day (which she did not), that does not entitle the Government to claim that the other nine hundred and twenty-four (924) subject transactions across both cards also constitute interchangeable use, particularly without any evidence thereof. Certainly, the Government has not cited any federal statute or appellate opinion that allows such overarching culpability based on a single transaction (nor could they do so based on defense counsel's extensive legal research relating thereto).

And if the Government *had* intended to include interchangeable credit-card use as part of the "scheme" it repeatedly refers to in defendants' Plea Agreements, it would have explicitly included that definition therein (but it did *not*). On the contrary, in their Plea Agreements, the Government reserved for defendants the right to seek a downward departure, including based on their widely disparate credit card charges. And the Court itself should not have to speculate about what the Government intended in its use of the word "scheme". And while Ms. Carlis' Plea Agreement does entitle the Government to force her to personally and individually pay restitution in the amount of the entire $272,481.91 loss, nowhere therein did she agree to plead guilty for all transactions that amounted to that figure (much less for purpose of a custodial sentencing enhancement).

In fact, the closest the Government comes to defining "scheme" is as follows:

> Defendant's fraudulent scheme operated, in substance, as follows: as part of her role as the Local 2620 executive board president, defendant held a Mastercard Inc. credit card in her name that could be used for purchases related to AFSCME and Local 2620 and was strictly prohibited for personal use by AFSCME's Financial Standards Code. Defendant instead used the credit card to make purchases for non-AFSCME-related expenses and for her personal benefit. Defendant then arranged for the AFSCME credit card bills – including purchases made for her personal benefit – to be paid using Local 2620's funds from Local 2620's checking account.

*See* Ms. Carlis' Plea Agreement, ¶ 9, 7:11-20. But nowhere therein is there any mention of sharing cards, interchangeable use, or even any reference to Ms. Herrera.

In its Supplemental Brief re Sentencing regarding Ms. Carlis, the Government repeatedly refers to her revised PSR as "evidence" of the alleged joint criminal enterprise. *See* Supp. Brief, at 4:17-18 ("Defendant and Herrera's fraudulent scheme is also set forth in the [revised] PSR. Dkt. 70, ¶¶ 28-38.") However, nowhere in those paragraphs of the

revised PSR, or anywhere else therein, does the Probation Officer define "scheme". And, as with the initial PSR, the Probation Officer – just as the Government itself – relies entirely upon Ms. Herrera's false claim as "evidence" that they shared cards, or otherwise merely relies upon the Government's own allegations without supporting evidence. In fact, ¶ 35 of the revised PSR identifies six (6) transactions where the defendants purchased luxury retail items for ***themselves/their own benefit***, but the Government nevertheless refers to that paragraph as proof of a joint criminal enterprise. In other words, the Government referring to the revised PSR -- which itself is based on the Government's allegations -- does not amount to objective evidence of this conspiracy or joint enterprise.

For example, the "scheme" could have simply referred to their individual attempts to cover up the illegal charges – though no evidence has been proffered that they *collectively* or otherwise worked jointly to that end. Their Plea Agreements certainly are silent as to whether they conspired together to do so. In other words, as with the Louis Vuitton receipt, the "scheme" as referred to in the Plea Agreements is subject to legitimate interpretation.

Next, in the Government's Supplemental Brief Re Sentencing regarding Ms. Carlis, it clearly implies that the terms of her Plea Agreement somehow prove that defendants' scheme necessarily included sharing credit cards because:

> Defendant and Herrera's ***personal***, non-union-related expenses were clearly within the scope of this scheme. Indeed, those expenses were the intended purpose of the scheme, and defendant admitted as much. Dkt. 39 at 7 ("Defendant instead used the credit card to make purchases for non-AFSCME-related expenses and **for her *personal* benefit**.") [and, therefore, *not* for *Ms. Herrera's* benefit].

*Id.* at 4:18-23 (emphasis added). In fact, however, defendants' independent use of their own union credit cards to make purchases for their own individual benefit directly contradicts this "interchangeable usage" theory.

Thus, the Government must prove defendants' joint use of the credit cards rather than merely and unjustifiably relying on their Plea Agreements, which explicitly allow:

> 11. … Defendant … to argue that additional specific ***offense characteristics***, adjustments, and departures under the Sentencing Guidelines are appropriate, including under U.S.S.G. § 2B1.1(b)(1)(G). … If defendant's offense level is so altered, defendant … will not be bound by the agreement to Sentencing Guideline factors set forth above. … 13. Defendant … reserve[s] the right to argue for a sentence outside the sentencing range established by the Sentencing Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7).

*See* Ms. Carlis' Plea Agreement, ¶¶ 11, 13 (emphasis added).

Indeed, nowhere therein is there any joint-scheme language (much less a recitation of facts supporting the same), such as "together with" or "in concert with" Ms. Herrera. In fact, Ms. Carlis' Plea Agreement confirms that as union treasurer, Ms. Herrera alone controlled the reimbursement and authorization statements that were submitted (or were supposed to be submitted) to the union for approval: "…[D]efendant … (2) fail[ed] to comply with AFSCME policy to ensure that the records detailing her credit card purchases **were presented by the treasurer Sofia Vanessa Herrera**…." ¶ 9 ("Factual Basis"), 7:26-8. In other words, based on these facts – and the Government's lack of evidence – it cannot satisfy U.S.S.G. § 1B1.3's "scope of agreement" factor.

Similarly, it was Ms. Herrera – and not Ms. Carlis – who tried to cover up her illegal charges by having the subject credit card statements sent to her own (Ms. Herrera's) house. Indeed, as treasurer, she was the only union official who had the power to have them sent to a specific address – and *not* Ms. Carlis. This is a critical error the Government made in all its filings to date in this matter.

This error, in turn, negates the Government's claim that defendants coordinated with each other, reviewed each other's charges, or shared in their spending, and also underscores the fact that the Government cannot meet the "in furtherance" factor because each defendant's personal retail purchases advanced only their own benefit and not for any shared enterprise. And simply because defendants each made illegal charges for their own benefit, and each took similar steps to cover up their crimes, does not prove that they did so for *each other as part of a joint enterprise*.

## IV.

## MS. CARLIS' FAMILY NEEDS ARE FAR MORE DIRE THAN MS. HERRERA'S AND MERIT SPECIAL CONSIDERATION BY THE COURT

At her sentencing hearing, Ms. Herrera sought leniency based in part on how her family would be adversely affected by her receiving a custodial sentence. Specifically, her husband, Joseph Robinson, had been seriously injured in a car accident, is ineligible to receive disability, will not be able to pay his bills, and will have to live with relatives while she is in prison. By contrast, as discussed in detail in her Sentencing Memorandum (12:13-14:5), Ms. Carlis' son, who is essentially permanently disabled because of his severe pathologies, including Bipolar Disorder, will be rendered homeless and unable to care for himself if she goes to prison. Nor can any other family members or friends, including Ms. Carlis' other son who constantly travels for work, take him in and care for him. As a result, Ms. Carlis respectfully requests that the Court take this into consideration when sentencing her.

## V.

## CONCLUSION

Enhancing Ms. Carlis' custodial sentence (if any) by allocating the entire $272,481.91 loss to her based solely on the word of a provably dishonest co-defendant (and a single receipt that is legitimately subject to interpretation as discussed in Ms. Carlis' Sentencing Memorandum) would set a dangerous precedent. Specifically, this would enable the Government to, for example, force a dozen co-defendants to be equally culpable for the entire credit-card loss without any proof of an agreement (tacit or otherwise) by each defendant to share the cards, and thereby *all* receive enhanced prison terms/upward departures from the Sentencing Guidelines. And without this agreement, the Government cannot satisfy the foreseeability factor in U.S.S.G. § 1B1.3.

Based on the foregoing, Ms. Carlis again respectfully requests that the Court impose the proposed sentence of 12 months' home confinement, 3 years of probation, and restitution.

///

Dated: November 18, 2026

Respectfully submitted,

**SAFFARI LAW GROUP, P.C.**

Ninaz Saffari, Esq.
Attorneys for Defendant
SHUKIMBA MALIK CARLIS

///

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on November 18, 2026, I electronically filed the foregoing, with the Clerk of the Court, by using the CM/ECF system, and sent a copy via email to the following:

THI HOANG HO, AUSA
U.S. Attorney's Office
312 N. Spring Street
Los Angeles, CA 90012
Thi.Ho@usdoj.gov.

Dated: November 18, 2026

Respectfully submitted,

**SAFFARI LAW GROUP, P.C.**

Ninaz Saffari, Esq.
Attorneys for Defendant
SHUKIMBA MALIK CARLIS